254 Cal.App.2d 309 (1967)
Estate of ANNIE L. LOCKWOOD, Deceased. WILLIAM B. ROLFE et al., Plaintiffs and Appellants,
v.
ALAN SWANSON et al., Defendants and Appellants.
Civ. No. 23755. 
California Court of Appeals. First Dist., Div. Three. 
Sept. 14, 1967.
 Haley, McInerney & Dillon and J. Fred Haley for Plaintiffs and Appellants.
 Jones, Griswold & Henley and Bruce P. Griswold for Defendants and Appellants.
 SALSMAN, J.
 This is an appeal from a judgment entered on a jury verdict denying probate of a codicil to the will of Annie L. Lockwood on the ground that the testatrix lacked testamentary capacity on February 28, 1964 when the codicil was executed, four days before her death. The will itself was admitted to probate, there being no question of Mrs. Lockwood's testamentary capacity on July 28, 1958 when it was executed.
 The codicil revoked the testatrix's gift of her entire estate to William and Irene Rolfe, close friends for many years, who had rendered personal services to her at various times, and substituted a gift of $5,000 to May Delaney and gave the *311 remainder of her estate to her heirs at law, Alan, Audrie and Sharon Swanson, who are appellants here. [fn. 1]
 The sole issue on appeal is whether there is any substantial evidence to support the verdict of the jury, which found, answering a special interrogatory of the court, that the testatrix was not mentally competent at the time she executed the codicil. In order to resolve this issue it is necessary to set forth the facts in detail.
 The testatrix was 89 years of age at the time of her death on March 3, 1964. An autopsy report gave the cause of death as cardiac failure due to arteriosclerotic heart disease, but the report also catalogued the many physical miseries from which the testatrix suffered at the end of her life. Among the findings were: (1) arteriosclerotic heart disease, (a) coronary atherosclerosis, severe, with calcification, (b) myocardial fibrosis; (2) bronchopneumonia; (3) rectal abscess with fistula to perineum; (4) cirrhosis of liver with central hemorrhagic necrosis; (5) cholecystitis with choledocholithiasis; (6) esophageal ulceration, focal; (7) enteritis, acute, secondary; (8) adenomyosis; (9) nephroateriolarsclerosis; (10) rib fracture, old.
 The testatrix was brought to the hospital on February 20, 1964, eight days before the execution of the codicil. Up to that date there was no serious question as to her mental competency. Her condition while in the hospital, that is, from February 20th to the date of her death on March 3d, is described by numerous witnesses, and as will appear, their testimony is in conflict as to the mental competency of the testatrix during that interval.
 Dr. Challen examined the testatrix on the 27th and again on the 28th and found her alert. Dr. Sharp saw her on the 21st, 25th and 29th and also found her alert. This witness also stated that the testatrix remained alert until the day of her death. The subscribing witnesses to the codicil, who of course were with the testatrix on the 28th when the codicil was executed, also testified that the testatrix was mentally alert, knew what she was doing, and answered questions logically and understandably at that time.
 Nurse Ludwig, who attended the testatrix as her day nurse from February 20th to the 26th, testified that the testatrix *312 was a very sick person. She described her many and grave physical ailments. As to her mental condition the witness said the testatrix was at times in a stupor or coma, and would be coherent for a few moments and then become incoherent for a period of three or four hours.
 Frank Crouse, an intimate friend of the testatrix, visited her at the hospital on the 25th. He found her in a semi-coma, hardly able to communicate with him. She asked his name, was told, and a few minutes later repeated the inquiry. He visited her again on March 1st, and on this date the testatrix could not communicate at all.
 Annie L. Crouse, also a close friend of the testatrix, visited her daily from the 20th to the 27th, and March 1st. She testified that on the 23d the testatrix became progressively worse and less communicative, giving only momentary recognition to her friend, then saying, "Who are you?" On the 27th she found the testatrix in a deep coma, eyes and mouth open, unable to recognize her visitor.
 Nurse Madeiros attended the testatrix from the 22d to the 27th. She testified that the testatrix was noisy and confused. Asked her opinion of the mental competency of the testatrix she replied: "At no time did I ever see any evidence that Mrs. Lockwood was--mentally clear. She always--appeared confused and disorientated. At no time was I ever able to carry on a conversation with Mrs. Lockwood. I don't remember there was ever anything understandable from her."
 Mrs. Rosalie King also attended Mrs. Lockwood as a nurse from February 25th through February 29th. She testified that the testatrix showed no acknowledgment or understanding. Although awake, she did not seem to be aware of her surroundings. She showed no recognition, and gradually slept more. Her condition became progressively worse, physically as well as mentally.
 Fred Cline's mother was a patient at the hospital and occupied the same room with the testatrix. He visited his mother frequently, and at such times observed Mrs. Lockwood. According to his testimony, Mrs. Lockwood appeared to get worse, and merely lay in bed, moaning and groaning. His mother was released from the hospital on March 3d, and on his visit a day or two before that date, Mrs. Lockwood w as "... breathing hard and gasping, as a person in a terminal case. ..."
 Dr. Burton W. Adams, a psychiatrist, testified from medical records, including the autopsy report. His opinion was that on *313 February 28th, when the codicil was executed, the testatrix was suffering from a hardening of the arteries, in the brain as well as the body, and that she was also suffering a severe impairment of her mental faculties as well as her physical health. Although the doctor admitted the possibility of periods of lucidity on February 28th he felt such an event unlikely because of her arteriosclerosis, infection and fever that prevailed throughout her hospital stay.
 The trial court gave accurate, full and complete instructions to the jury. They were instructed on direct and indirect evidence, presumptions and inferences, and told that: "An inference is a deduction which the reason of the jury draws from the facts proved." They were instructed that the contestants had the burden of proving that the testatrix was not mentally competent to execute her codicil on the 28th of February, and that proof had to be by a preponderance of the evidence. A special interrogatory was given to the jury, with instructions to find whether the testatrix was mentally competent to execute said codicil to her will on the 28th day of February, 1964. The court then gave the jury the test by which it was to measure mental competency, instructing them in substantially the language used in Estate of Lingenfelter, 38 Cal.2d 571, 582 [241 P.2d 990]. The instruction declared that: [1a] "The determinants of testamentary capacity are whether or not the decedent had sufficient mental capacity to be able to understand the nature of the act she was doing, and to understand and recollect the nature and situation of her property, and to remember and understand her relations to the persons who have claim upon her bounty and whose interests are affected by the provisions of the instrument." The jury was further instructed that the contestants were required to prove testamentary incapacity at the very moment of the execution of the will, and that a contestant must prove that the will was not made at a lucid interval. The court also instructed that: "Not every weakness and impairment of the faculties of a testatrix will invalidate a will or codicil. Even where a testatrix is feeble in health, suffering from disease and aged and infirm, yet if she was sufficiently of sound mind to be capable of understanding the nature and situation of her property, and disposing thereof intelligently, without any delusions affecting her actions, she had sufficient capacity to make a will or codicil."
 Finally, the jurors were told "... that evidence of the condition of the testator's mind, both before and after the *314 date of the codicil's execution, shall only be considered by you for whatever weight you may see fit to give the same, guided by my instructions, only as it bears on the mental condition of the testatrix at the very time of the codicil's execution."
 Upon submission, as we have related, the jury found the testatrix mentally incompetent to execute the codicil to her will. The superior court denied appellants' motion for judgment notwithstanding the verdict, and also denied their motion for a new trial.
 [2] In contending that the judgment is not supported by the evidence, appellants first emphasize the well established rule that testamentary capacity is presumed (Estate of Schwartz, 67 Cal.App.2d 512, 519 [155 P.2d 76]) and that testamentary incapacity must be shown to exist at the very time a will or codicil is executed in order to invalidate the instrument on this ground. (Estate of Russell, 80 Cal.App.2d 711, 719 [182 P.2d 318].) Appellants then argue that nothing more is shown by the evidence in this case than that the testatrix was an old, feeble and very ill lady at the time she executed the codicil to her will, and that this evidence falls far short of proving testamentary incapacity.
 The proponents of the codicil did produce evidence through the testimony of the subscribing witnesses to the instrument to show that at the time it was executed the testatrix was of sound mind. But there was contrary evidence. Thus Mrs. King, one of the hospital nurses who cared for the testatrix from the 25th of February to the 29th, including the day upon which the codicil was executed, testified that Mrs. Lockwood showed no recognition or understanding during that period of time, and did not realize or understand her surroundings. Other witnesses, however, were able only to testify as to Mrs. Lockwood's testamentary capacity before and after the date the codicil was executed. There was testimony that both before and after February 28th the testatrix was often in deep coma, unable to be aroused, unable to recognize old friends or to remember who such friends were even for brief moments after being told. Several witnesses testified that conversation and communication with the testatrix while she was in the hospital was virtually impossible. Thus the evidence shows that both before and after the 28th the testatrix, overcome both physically and mentally by the extremities of age and her many physical ailments, was unable to communicate with her nurses and old friends and was often, if not *315 continuously, in a semi-coma from which she could not be aroused. It may be inferred from this evidence that, before the codicil was executed, and afterwards to the time of her death a few days later, the condition of the testatrix remained the same.
 [3] It has been held that, once it is shown that testamentary incapacity exists, and that it is caused by a mental disorder of a general and continuous nature, the inference is reasonable that the incompetency continues to exist. (Estate of Fosselman, 48 Cal.2d 179, 186 [308 P.2d 336].) Appellants would distinguish Fosselman, and limit its application to those cases where the evidence discloses the existence of a "... mental disorder of a general and continuous nature. ..." They argue there is no evidence here that the testatrix suffered from any mental disorder or illness, but that she merely suffered the disabilities of old age. But the decisive question is not the presence of some recognizable mental disorder that can be described by name, but rather the presence or absence of testamentary capacity when tested by the factors described in Lingenfelter, supra.
 [1b] In Lingenfelter our Supreme Court, quoting from Estate of Smith, 200 Cal. 152, 158 [252 P. 325], restated the factors by which testamentary capacity must be measured. The trial court in this case instructed the jury in substantially the same language quoted in Lingenfelter, and in effect told them they were to follow that rule in determining whether or not Mrs. Lockwood was of sound and disposing mind at the time she executed the codicil to her will.
 [4] Whether a testator has testamentary capacity at the time of the making of his will depends upon the facts found by the trier of fact. Thus, in every case, the fact finder must weigh and evaluate all of the evidence, and from it find whether the testator had sufficient mental capacity to understand his act, to recollect the nature and situation of his property, to remember and understand his relationship to persons who have claims upon his bounty and whose interests may be affected by the instrument he is about to execute. This is a pure fact finding function, and once the facts are found by the trier of fact we must treat the findings with respect, and uphold them if they are supported by substantial evidence. In a will contest, as in any other case, the trier of fact is the sole judge of the credibility and weight of the evidence. (Estate of Teel, 25 Cal.2d 520, 526 [154 P.2d 384], and cases cited; Estate of Bristol, 23 Cal.2d 221, 223 [143 P.2d 689].) *316
 [5] In the case we here consider, the jury could readily infer from the evidence that before the 28th of February Mrs. Lockwood's condition was such that she could not understand the act of making a codicil to her will, or remember or understand her relation to persons who had a rightful claim to her bounty. We think the jury by its verdict, and the trial judge by denying the motion for judgment notwithstanding the verdict, and also in denying appellants' motion for a new trial, were justified in concluding that the decedent, weakened by age, illness and disease, lacked testamentary capacity both before and after she executed the codicil to her will, and in inferring that such lack of capacity existed at the very moment the codicil was executed. (See Estate of Teel, supra, 25 Cal.2d 520, 527.) Accordingly, we affirm the judgment.
 The Rolfes have appealed from that portion of the judgment which is based upon the trial court's order directing the jury to return a verdict finding that the decedent was not acting under undue influence of any beneficiary or an agent of any beneficiary, but since we affirm the judgment denying probate to the codicil to the will, it is unnecessary to consider the Rolfes' appeal and it is dismissed.
 The judgment is affirmed. William B. Rolfe and Irene Rolfe to recover costs on appeal.
 Draper, P. J., concurred.
NOTES
[fn. 1] 1. Our reference to appellants herein refers only to the Swansons, who are the proponents of the codicil to the will of Mrs. Lockwood. William B. Rolfe and Irene Rolfe have also appealed, but for reasons later stated, their appeal will be dismissed.