Filed 9/27/23  Accomazzo v. Ashley CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| STEVEN ACCOMAZZO et al., | C092297 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV1700025 ) |
| v. | |
| ROBERT ASHLEY et al., | |
| Defendants and Respondents. | |

Stacey Accomazzo (Stacey), now deceased, owned a cabin in Blairsden in Plumas County.  On February 5, 2017, in a hospital ICU, with the assistance of defendant Alice King, an attorney, Stacey executed a deed gifting the cabin to defendant Robert Ashley (Robert).  Plaintiffs Steven Accomazzo (Steven), Stacey's brother, and Nate Accomazzo (Nate), Stacey's nephew, commenced this action against Robert, Robert's mother, defendant Marilyn Ashley (Marilyn), and King.  Among other things, plaintiffs asserted Robert committed fraud and financial abuse of a dependent adult and that King committed legal malpractice.

1

A jury found in favor of plaintiffs and against Robert on the fraud and financial abuse of a dependent adult causes of action and in favor of plaintiffs and against King on the legal malpractice cause of action. Robert and King separately moved for judgment notwithstanding the verdict and the trial court granted both motions. Then, in granting what Robert denominated a motion for reconsideration, the trial court set aside the jury's special verdict finding that Stacey lacked capacity when he signed the deed, decided itself what it determined to be the equitable causes of action to quiet title and cancel the deed, and entered judgment in favor of Robert on those causes of action.

On appeal, plaintiffs assert: (1) in granting defendants' motions for judgment notwithstanding the verdict, the trial court deprived them of their right to a jury trial, (2) substantial evidence supported the jury's verdicts on the fraud, financial abuse of a dependent adult, and legal malpractice causes of action, and therefore the court erred in granting defendants' motions for judgment notwithstanding the verdict, (3) the trial court erred in granting Robert's motion for reconsideration and quieting title in favor of Robert, and (4) the court erred in failing to consider procedural defects in both motions for judgment notwithstanding the verdict.

Agreeing with plaintiffs' third point, we will reverse the part of the judgment that quieted title to the subject property in favor of Robert, reinstate the jury's special verdict finding Stacey lacked capacity at the time he executed the deed, and remand for further proceedings. Otherwise, we affirm the judgment.

## BACKGROUND

The operative fourth amended complaint set forth 14 causes of action. At issue on this appeal are only the causes of action for cancellation of the deed (first cause of action), to quiet title (second cause of action), for financial abuse of a dependent adult (third cause of action), for fraud and deceit (fifth cause of action), and for legal malpractice (sixth cause of action).

***The Trial***

<u>Stacey Accomazzo and the Roosenschoons</u>

Eric Roosenschoon (Eric) characterized Stacey as his closest friend and described him as like an "older brother." Karin Roosenschoon (Karin), Eric's sister, and Eric had known Stacey for more than 20 years. Eric saw Stacey at least once a week. Stacey spent most holidays with Eric and his family at Eric's home.

<u>Stacey Accomazzo and Robert Ashley</u>

Robert's grandfather Carl Ashley was partners with Ernest Accomazzo, Stacey's father, in a tile business. Robert's family owned a cabin in Blairsden since the 1960's where they vacationed. That cabin was next to Stacey's cabin. Robert testified Stacey was a lifelong friend, that Stacey and Ernest were like family, and that he went fishing and shooting with Stacey and they would spend evenings eating dinner and drinking cocktails together.

In October 2010, Robert spent at least 30 days with Stacey redoing the living room at Robert's family's cabin. Robert and Stacey got to know each other very well during this time.

Robert graduated from law school and passed the bar exam in 2015. During law school, Robert would go to his family's cabin at various times during the year. Often he would bring law school friends with him and Stacey would spend time with them drinking beer and eating meals, a fact at least three law school friends corroborated. There was also a three-month period in 2015 during which Stacey worked on and stayed at Robert's family's house in Marin.

Robert testified that Stacey and Ernest would come to Robert's aunt and uncle's house, near the cabins, for new year celebrations. According to Robert, this occurred at least six or seven times. Robert also testified Stacey would spend Christmases and Thanksgivings with Robert and his family. Robert testified Stacey may have gone to the Roosenschoons' before coming over.

3

Eric, Karin, and Karin's mother, Theresia Visser, testified that, before he was diagnosed with cancer, Stacey never mentioned Robert. He did not mention hanging around at his house with "college kids." Eric never met Robert in the years he knew Stacey. Neither Nate nor Tyler Accomazzo, another of Stacey's nephews, had ever heard of Robert prior to this litigation. While Steven, Stacey's brother, acknowledged the family relation between the Accomazzos and the Ashleys and the tile business, he testified Stacey never mentioned any relationship with Robert. They merely had neighboring cabins.

Robert and his mother, Marilyn, acknowledged they did not have any photographs of Robert and Stacey together.

Stacey's Wishes for the Cabin As Expressed to His Family and the Roosenschoons

Stacey began to get sick in November or December 2016. He was diagnosed with terminal small cell lung cancer.

Karin testified that Stacey had said Steven was not good with money. Stacey, who did not have children, wanted his property to go to his nephews, Steven's kids. He knew they had memories of the property and "he wanted them to be able to keep that going." Stacey told Eric he wanted the cabin placed in a trust for his nephews. Nate, one of the nephews, testified Stacey told him in 2013 that he wanted to leave the cabin to Nate and his brothers. Stacey told Steven several times after he became sick that he intended the cabin "to stay within the family to my nephews."

The Meeting at the Roosenschoon House

Robert and Marilyn came to visit Stacey at Karin's house in January 2017, at which time Stacey was staying at the house so that Karin, who was a registered nurse, could care for him. Visser, Karin's mother, was also there.

Stacey said he had been debating what to do with his cabin, whether to sell it and give his nephews the money or put it in a trust. He decided he did not want to sell the property, and instead wanted it to go into a trust. Karin heard Robert tell Stacey he was a

4

lawyer, he could create the trust and help Stacey with any paperwork, and that he would do so for free. Stacey said he was not ready to make a final decision. Karin testified there was no discussion of Stacey gifting the property to Robert.

As Visser recalled it, Stacey said he wanted the cabin put in Nate's name so that it could stay in the family. Stacey indicated he did not have the money for a lawyer, and Robert responded that he was a lawyer and could draft the paperwork for free. Visser also testified Stacey never indicated he wanted to give his cabin to Robert.

Robert and Marilyn recalled the meeting differently. Robert testified that, during the conversation he and Marilyn had with Stacey, Karin and Visser were not in the room. Robert, Marilyn, and Stacey reminisced for a while. Stacey told Robert that they had always been close, Robert's family had always been there for him, and that Stacey would like Robert to have his cabin. Robert and Marilyn were shocked. Marilyn asked about Steven and about Stacey's nephews, and Stacey responded, "They don't give a shit about me and I don't give a shit about them. Steven came to visit me in the hospital one time. He stayed ten minutes, and the other boys never called and never contacted, never came up to see" him while he was in the hospital.

Robert testified Karin rushed out of the kitchen and suggested a trust for Steven and Stacey's nephews. Robert got up and said he did not want to be part of the conversation because he was concerned about creating an attorney-client relationship with Stacey, and he told Stacey he would have to get an attorney. Robert went to the restroom. When Robert returned, he apologized to Stacey, said he could not continue to listen to the conversation, and said he had to leave. Stacey asked Marilyn to call his attorney, Alice King.

King's Involvement

King represented Stacey in his father's conservatorship proceedings and in the 2012 distribution of his father's estate, which resulted in Stacey's ownership of the cabin. She had not been in contact with Stacey since.

5

According to phone records, Stacey called King's office on January 30, 2017, but King did not receive that call. The next day, Marilyn called King about Stacey's cabin. King was confused why Marilyn would be contacting her about Stacey's property, and Marilyn said she would have Robert call her.

Robert called King and told her he was friends with Stacey. He told King that Stacey wanted to give him the cabin, and that he wanted to do so by gift deed to avoid probate, all of which King intended to confirm with Stacey when she met with him. King testified that Stacey was her client and she intended to meet with him to ascertain his feelings on the matter. During their conversation, Robert did not ask King to perform any services. Robert "never asked [her] to prepare a gift deed to Robert." Robert also never said anything to King about Stacey wanting his property to be placed in a trust for his nephews.

King was asked about an e-mail Robert sent her, in which he stated: "For the deed did you include life estate language? I was laying in bed and remembered that life estates can be collected by [the California Department of Health Care Services], so if it's in there could we remove that to protect Stacey from collection?" King testified this "came out of the blue. It was not in response to something I said." They did not discuss the matter further. At some point prior to meeting with Stacey on February 5, 2017, King prepared a gift deed.

Stacey's Admission to the Hospital and the Execution of the Deed

Stacey was admitted to Renown Regional Medical Center in Reno on or about February 2, 2017, at which time he was septic. He had a perforated bowel and underwent trauma surgery.

Eric visited Stacey in the ICU right after he was taken off life support. That was the same day that Robert was supposed to visit Stacey. According to Eric, Stacey mentioned that he "thought they were coming that day to sign the trust" and that Robert was coming to "make the trust or sign the trust to put the cabin in the nephews' name."

6

Eric testified Stacey was "in and out of coherency" and "pretty heavily medicated." "He just wasn't all there."

Robert testified that, on February 5, 2017, Stacey seemed like "normal old Stacey." That day, Stacey told Robert he did not have his wallet or cell phone charger, and asked Robert to go get them. He said they were at Karin's house and specified exactly where they could be found. Robert left Renown Regional Medical Center, retrieved the items from where Stacey had said they were, and returned.

About 15 to 20 minutes after Robert returned, at approximately 2:00 p.m., King arrived. She knew Stacey had recently been taken off life support. She acknowledged that, while she called the hospital beforehand to see if the hospital had an ombudsman, she did not speak to a doctor concerning Stacey's condition. King testified that exhibit 45, a medical record entry for February 5, said Stacey was "oriented times four." When King arrived, Robert left the room.

King thought Stacey "looked like the same old Stacey . . . ." Although he was thin, he was sitting up, he was smiling, and he had "a twinkle in his eye." Stacey recognized King.

Stacey and King talked about the past and the work they did together, and Stacey remembered everything. He recalled his father and his brother. Stacey knew who his family was and he knew what his property was. King observed Stacey to be attentive for the entire time she was with him. He did not wander off topic. King observed no indication of disordered thinking, and Stacey did not do or say anything to suggest he was hallucinating or suffering from delusions. Stacey remained calm for the duration of the meeting. He did not fall asleep. King did not know what medication Stacey was on at the time.

Stacey told King he wanted to give his cabin to Robert. Stacey told King that Robert was his best friend. Stacey said that Steven could have his bank account and his

7

vehicle. However, he said he did not want Steven to get the cabin. He wanted the cabin to go to Robert. Stacey did not mention his nephews to King.

King discussed various options with Stacey including revocable trusts, transfer-on-death deeds, and other options. King suggested they prepare a will or trust. Stacey said he did not want a will because he did not "want this to go to probate." Additionally, he said a trust would take too long.

Stacey signed the gift deed King had prepared, giving the property to Robert, and a notary notarized the deed. The meeting lasted approximately 30 minutes.

Medical Expert Testimony on Capacity

Dr. Shelley Salpeter, plaintiffs' medical expert, reviewed Stacey's medical records. She never saw or communicated with Stacey.

Salpeter testified that, with regard to orientation, patients are asked if they know (1) their name, (2) the date, (3) their location, and (4) their current situation. One who knows all four would be categorized as alert and oriented times four.

Salpeter testified at length about delirium, which she defined as "periods of inattention with disordered or disorganized thinking or a changed level of consciousness, which is characterized by mental confusion and difficulty concentrating." A patient's risk factors for delirium in the ICU include age, underlying illness, alcoholism, and chronic lung disease or end stage cancer. In addition, precipitating factors of acute illness must also be considered. Salpeter testified Stacey had every risk factor when he signed the deed. She testified it would be "essentially impossible" to not be delirious in his circumstances.

Salpeter testified that some people have "strictly calm delirium" and others have "strictly agitated" delirium. However, others cycle between calm and agitated, and it can be difficult to recognize delirium without doing a full cognitive assessment. A patient does not go in and out of delirium, but rather, once a patient becomes delirious, the patient remains delirious until the delirium resolves days or weeks later.

8

Salpeter testified, with a "very high probability of certainty," that Stacey was delirious and lacked decisionmaking capacity on February 5 at 2:00 p.m. when he signed the deed. She explained that Stacey developed delirium in the ICU on February 3, and that delirium "continued through the 20th and mainly [*sic*] a bit into the 24th when he was discharged . . . ." She testified that if King said Stacey was alert, lucid, and calm, it just meant he was in a state of calm delirium and was alert rather than sedated.

Salpeter stated that, according to medical records, by 10:00 p.m. on February 4, Stacey was disoriented to time and situation. He also had decreased attention and concentration. The records indicated that at 8:00 a.m. on February 5, the day he signed the deed, Stacey was confused and he had poor safety awareness, as he was trying to pull out his intravenous lines. At that time, he was disoriented to event and time, but was alert and his speech was clear. Salpeter opined that, at that time, Stacey lacked decisionmaking capacity and had delirium. At noon, he was confused, had continued poor safety awareness, and was disoriented to time and events, but he was alert and his speech was clear. Salpeter acknowledged two other February 5 entries. One, exhibit 44, indicated Stacey was "oriented to person, place and time, he is active and cooperative . . . ." Another, exhibit 45, stated Stacey was alert and oriented times four.

Salpeter did not think someone not trained in formal decisional capacity assessment, such as King, would be able to make an accurate assessment.

The plaintiffs also read into the record the deposition testimony of Dr. Ellen Lynn Brogan, who worked for Renown Regional Medical Center in Reno. The focus of her practice was palliative medicine, hospice, and end of life care. Brogan testified that Stacey lacked capacity to sign financial documents from the time of his surgery until February 15, 2017. He was extremely ill and he was postoperative, and thus postanesthesia.

The Ashleys' medical expert, Dr. Neal Benewitz, testified that whether an individual on morphine would be impaired would depend on the situation, the dose, and

9

the level of tolerance. As of February 5, Stacey had patient-controlled morphine, meaning he could push a button which would result in the administration of a small dose. In relation to when Stacey signed the deed at approximately 2:00 p.m., there was no way to tell when Stacey administered morphine or how much. Benewitz testified the anesthetic drugs used for Stacey's surgery would have been eliminated from his system by 2:00 p.m. on February 5.

Considering King's deposition testimony, in which she stated that Stacey demonstrated he knew who he was, who his father was, who his brother was, what his assets were, and how he wanted his assets distributed, Benewitz testified that these were indications of Stacey's mental capacity. Benewitz emphasized indications of Stacey's ability to pay attention, including that, according to King, he was able to pay attention to a somewhat complicated conversation and he understood the implications of the deed and did not think it was a good idea to give the cabin to his brother.

Benewitz did not think the medical records demonstrated Stacey lacked capacity on the day he signed the deed. Benewitz testified Stacey "certainly had been delirious at times, but the only way to assess his capacity was to do a detailed interview." King's interview appeared to show Stacey had capacity. Benewitz opined there was no "way to do it by looking at the medical records." He testified Stacey had delirium in the ICU; the question was whether he was delirious at 2:00 p.m. on February 5. He acknowledged that a note indicated that, earlier in the day, Stacey was in a confused state, but he further emphasized that other notes indicated Stacey was oriented and cooperative.

Legal Expert Testimony on King's Conduct

Marshal Oldman, plaintiffs' legal expert, testified he believed there was a series of e-mails between King and Robert "about what to put in the deed." Oldman opined that King violated her duty to Stacey as an attorney by engaging in e-mail conversations with Robert. He further testified King violated her duty to Stacey by "taking instruction from a third party who is asking for Stacey's home . . . ." Oldman emphasized the e-mail in

10

which Robert indicated he had trouble sleeping because he was preoccupied with what might happen if Stacey retained a life estate in the cabin.

As Oldman characterized it: "Ms. King was contacted as attorney for the grantor, [Stacey]. And the contact was from the grantee. And she engaged in conversation, either by email or directly with the grantee and his mother in order to facilitate the creation of the deed satisfactory to the grantee, but never spoke to the grantor, her client." Oldman opined King's conduct fell below the standard of care because she should have been in contact with Stacey after her first discussion with Marilyn or Robert so that she could ascertain Stacey's wishes. Oldman also believed King violated the attorney's duty of care by arriving at the hospital with the grant deed but without any other instruments to offer.

On cross-examination, Oldman acknowledged the e-mails between Robert and King generally related to the logistics of arranging King's meeting with Stacey.

Oldman testified that a reasonable attorney should have discussed Stacey's decisionmaking capacity with medical personnel. However, he acknowledged he could not cite any authority that supported his opinion that consultation with medical personal was required.

Carl Leverenz, King's expert, testified King acted reasonably. He opined that King determined Stacey made a decision, it was consistent with what she knew about him, and it reflected what he wanted to do and that he wanted to do it immediately. He acknowledged it could be a "red flag" when a client is in the hospital, but an attorney may then confirm that the client knows what he or she is doing.

### Verdicts

In a special verdict, the jury found Stacey lacked capacity at the time he executed the deed. The jury found Robert liable on causes of action for promissory fraud and financial abuse of a dependent adult and found King liable for professional negligence.

11

*Judgment Notwithstanding the Verdict*

King and Robert moved for judgment notwithstanding the verdict pursuant to Code of Civil Procedure section 629.

The trial court granted King's motion. The court concluded that "King fulfilled her professional duty when she spoke with her client and ascertained he was in a normal state of mind and wanted to make the grant. She is <u>not</u> required to have the knowledge and skill in mental assessment that a highly trained and educated <u>medical</u> professional might possess."

The trial court also granted Robert's motion as to the fraud and financial abuse of a dependent adult causes of action. The court concluded there was no evidence to support a finding of fraud because Robert made no promise with intent to defraud. According to the court, the purported promise to create a trust was a vague proposal to do a future act, insufficient to support a fraud cause of action. For largely the same reasons, the court concluded there was nothing to support a finding of financial abuse of a dependent adult. The court left undisturbed the special verdict in favor of plaintiffs on lack of capacity.

Subsequently, Robert moved for "reconsideration" on the grounds that the equitable issue of quiet title was within the exclusive province of the court, not the jury. On February 13, 2020, the trial court filed what it denominated its statement of decision on equitable issues. Exercising what it concluded to be its exclusive jurisdiction over the equitable causes of action to quiet title and cancel the deed, the trial court granted the motion, setting aside the jury's special verdict finding Stacey lacked capacity. The court found there was insufficient evidence to overcome the presumption that Stacey had the capacity to execute the deed.

The trial court entered judgment, as relevant here, in favor of King notwithstanding the verdict, and in favor of Robert notwithstanding the verdict on the

12

causes of action for promissory fraud and financial abuse of a dependent adult and on the equitable causes of action to quiet title and cancel the deed.

## DISCUSSION

## I

### *Appellate Procedure*

The rules of appellate procedure "require an appellate brief to support each point by argument and, if possible, by citation to authority and to provide a citation to the record for a factual assertion." (*County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861, citing Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).) " '[W]e may disregard factual contentions that are not supported by citations to the record [citation] or are based on information that is outside the record [citation].' " (*County of Sacramento,* at p. 861.)

Plaintiffs' briefing frequently fails to support factual assertions with citations to the record. The factual background section of their opening brief, more than five pages in length, contains a single citation to the record. Substantial portions of the argument section do not include citations to the record to support factual representations. "We are not required to scour the record in search of support for a party's factual statements and may disregard such unsupported statements." (*Harshad & Nasir Corp. v. Global Sign Systems, Inc.* (2017) 14 Cal.App.5th 523, 527, fn. 3.) Plaintiffs' briefing also contains assertions that are contrary to the record. For example, plaintiffs assert King conspired with Robert and engaged in fraudulent conduct; the trial court specifically instructed the jury there were no allegations of fraud against King. Robert, in his brief, requests that we strike some or all of plaintiffs' brief. To the extent this request, which was not made by motion, is properly before us, we deny it. However, we do note these shortcomings have not helped plaintiffs satisfy their burden as appellants of proving reversible error (see *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766), and we caution plaintiffs against such shortcomings in future filings.

13

## II

### *Right to Jury Trial*

Plaintiffs assert that, in granting defendants' motions for judgment notwithstanding the verdict, the trial court deprived them of their right to a jury trial. Plaintiffs further contend the trial court invaded the province of the jury by making factual findings. Plaintiffs concede, however, that a motion for judgment notwithstanding the verdict "may be granted . . . if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) Thus, whether plaintiffs' contention has any merit depends entirely on whether there was substantial evidence supporting the jury's verdicts in their favor. Accordingly, we proceed to consideration of that issue.

## III

### *Substantial Evidence*

Plaintiffs assert substantial evidence supported their fraud, financial abuse of a dependent adult, and legal malpractice claims. While we respect the jury and its vital role in our justice system, ultimately, we conclude the trial court properly granted the motions for judgment notwithstanding the verdict as no substantial evidence supported the verdicts on these causes of action.

As stated, "[a] motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs, supra*, 25 Cal.4th at p. 68.) " 'As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.' [Citation.] . . . However, to the extent a motion for judgment notwithstanding the verdict raises legal issues such as the application of law to undisputed facts or the interpretation of a statute or contract, we

14

review the trial court's ruling on the motion de novo." (*Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598, quoting *Sweatman*, at p. 68.) As it is generally defined, " '[s]ubstantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

### 1. Promissory Fraud – Robert

The first claim is that Robert committed promissory fraud based on his promise to create a trust for Stacey's nephews. "THE NECESSARY ELEMENTS OF FRAUD ARE: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.) " 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) " ' [P]romissory fraud requires proof of "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e]." ' " (*Missakian v. Amusement Industry, Inc.* (2021) 69 Cal.App.5th 630, 654.)

Even if there was evidence Robert made a promise to create a trust for the benefit of Stacey's nephews with no intention of performing that promise and with the intent to deceive or induce, we conclude there is no substantial evidence that Stacey justifiably or reasonably relied on this promise in signing the deed, or of causation. Any such justifiable reliance was extinguished by King's superseding involvement.

15

"Justifiable reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which alters his legal relations, and when without such misrepresentation or nondisclosure he would not, in all reasonable probability, have entered into the contract or other transaction." (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108, superseded by statute on another ground as stated in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19; see *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1062 [there are two causation elements in fraud cause of action:  (1) *justifiable reliance on defendant's misrepresentation must have caused plaintiff to take a detrimental course of action*, (2) the detrimental action taken by plaintiff must have caused plaintiff's damage].)

On February 5, 2017, King met with Stacey at the hospital for approximately 30 minutes.  Stacey talked about his cabin and said he wanted to give it to Robert.  He did not mention his nephews to King.  King discussed various options with Stacey including a will, a trust, and other options.  Stacey did not want a will because he did not "want this to go to probate."  He specifically said a trust would take too long.  Stacey signed the deed King had prepared.

King's testimony about her involvement dispels any possibility Stacey was justifiably relying on Robert's promise to create a trust to benefit Stacey's nephews and that his justifiable reliance on Robert's misrepresentation caused him to take the detrimental course of action of executing the deed.  There is no evidence to support the premise that Robert's promise was "an immediate cause of the plaintiff's conduct which alter[ed] [Stacey's] legal relations," and without which Stacey would not, in all reasonable probability, have signed the deed presented to him by King.  (*Molko v. Holy Spirit Assn., supra*, 46 Cal.3d at p. 1108.)

With regard to the possibility King may have been involved in the fraud, based on its prior rulings, the trial court explicitly instructed the jurors that the allegations of fraud "do not exist against . . . King."

16

The notion that Robert could have advised Stacey to execute a deed provided by King transferring the property to Robert as a gift to somehow effect the creation of the trust Robert promised, and Stacey justifiably relied on Robert's promise notwithstanding Stacey's consultation with King, would be speculation unsupported by evidence in the record. Speculation is not substantial evidence. (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.) And, again, Stacey told King he did not want a trust because a trust would take too long.

Plaintiffs emphasize Eric's testimony about his visit with Stacey earlier on February 5, 2017. Eric testified that Stacey mentioned he "thought they were coming that day to sign the trust" and that Robert was coming to "make the trust or sign the trust to put the cabin in the nephews' name." However, again, King's involvement and her discussions with Stacey, uncontradicted by any evidence in the record, dispels any possibility Stacey signed the deed in justifiable reliance on a promise made by Robert and that justifiable reliance caused Stacey to take a detrimental course of action.

Plaintiffs also emphasize that Robert was an attorney experienced with trusts and estates, suggesting that this establishes Stacey's reliance was justifiable. As a general matter, Stacey could have justifiably relied on Robert's promise, as an attorney, to draft a trust. However, any such justifiable reliance was extinguished by King's superseding involvement.

In the absence of any substantial evidence supporting the element of justifiable reliance or that such justifiable reliance caused Stacey to take a detrimental course of action, the trial court properly granted Robert's motion for judgment notwithstanding the verdict on the fraudulent promise cause of action.

### 2. Financial Abuse of a Dependent Adult – Robert

Plaintiffs assert the "same arguments . . . regarding the substantial evidence presented as to Stacey's lack of decision-making capacity and [Robert's] fraud apply" to the financial abuse of a dependent adult cause of action.

17

Financial abuse of a dependent adult is defined by statute: " 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70." (Welf. & Inst. Code, § 15610.30, subd. (a).) Of course, " ' " '[c]ausation' is an essential element of a tort action. Defendants are not liable unless their conduct . . . was a 'legal cause' of plaintiff's injury." ' " (*Beebe v. Wonderful Pistachios & Almonds LLC* (2023) 92 Cal.App.5th 351, 369.)

Similar to the promissory fraud cause of action, King's involvement severed any connection between anything Robert did and Stacey's transfer of the property to Robert by a deed prepared by King following consultation with her. Robert did not participate in King's consultation with Stacey, in which she discussed various options with him, or in Stacey's execution of the deed. And, as discussed above, King was not involved in any fraudulent scheme. Regardless of Robert's intent when he allegedly promised to create a trust to benefit Stacey's nephews, once King became involved, consulted with Stacey, and Stacey executed the deed, it cannot be said Robert took, secreted, appropriated, obtained, or retained, or assisted in taking, secreting, appropriating, obtaining, or retaining, real or personal property of a dependent adult for a wrongful use, with intent to defraud, or by undue influence. (See Welf. & Inst. Code, § 15610.30, subd. (a).)

### 3. Legal Malpractice – King

Plaintiffs assert that, in granting King's motion for judgment notwithstanding the verdict, the trial court ignored expert testimony that established King committed legal

malpractice. Plaintiffs emphasize Oldman's opinion that King committed malpractice by (1) corresponding with and taking instructions from Robert before speaking with Stacey, (2) preparing only a grant deed to bring to the ICU, and (3) allowing Stacey to sign the deed despite issues of capacity.

" ' "The failure to provide competent representation in a civil or criminal case may be the basis for civil liability under a theory of professional negligence. In a legal malpractice action arising from a civil proceeding, the elements are (1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence." ' " (*Jones v. Whisenand* (2017) 8 Cal.App.5th 543, 550 (*Jones*).)

### A. Duty to Potential Beneficiaries/Rights of Successors-in-Interest

King argues at length that she did not have any duty to plaintiffs as nonclients and potential beneficiaries. However, plaintiffs assert, and asserted in the complaint, that they sought to recover as Stacey's successors in interest.

"Except as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period." (Code Civ. Proc., § 377.20, subd. (a).) Courts have concluded that claims for professional *medical* negligence survive the death of the patient. (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 413 [discussing survivor's claim for professional negligence against hospital].) King has not directed us to any statute or case law stating a claim for legal malpractice does not survive the death of the client. Assuming Stacey's cause of action for legal malpractice survived his death, it would pass to his successor in interest, who may commence an action to recover on the cause of action. (Code Civ. Proc., § 377.30.)

19

## B. E-mail Correspondence Between King and Robert

Oldman opined King violated her duty to Stacey by e-mailing with Robert. However, on cross-examination, he acknowledged the e-mails generally related to the logistics of arranging King's meeting with Stacey. Plaintiffs provide no authority for the premise that communicating with a third party about arranging a meeting between an attorney and a client is evidence of attorney malpractice. Moreover, King testified Robert did not ask her to perform any services and he "never asked [her] to prepare a gift deed to Robert."

Oldman further opined King violated her duty to Stacey by "taking instruction from a third party who is asking for Stacey's home . . . ." Oldman emphasized the e-mail in which Robert expressed concern about Stacey reserving a life estate. However, as near as we can discern from the record, in that e-mail, Robert expressed this concern because "life estates can be collected by" the Department of Health and Children's Services, and he asked King if a life estate could be omitted from any deed "to protect Stacey from collection." King testified this e-mail "came out of the blue," was not in response to anything King had said, and they did not discuss the matter further. We cannot deem this unsolicited e-mail to be evidence of King's legal malpractice.

## C. Preparing Only the Deed

Oldman testified King violated her duty by arriving at the hospital with the deed and no other instruments to suggest. Oldman acknowledged King's deposition testimony in which she testified "it was a matter of time in terms of preparing a document and showing him. But I feel that any other documents I would prepare for him I would need to see him first. The only thing I could prepare ahead of time would be a grant deed because I knew him, I knew the property. And I said, but if we are going to do a trust I would have to ask him a bunch of questions before I could have prepared the document."

Prior to King's meeting with Stacey, Robert told King that Stacey wanted to give the cabin to Robert and that he wanted to do so by gift deed to avoid probate. King

20

intended to confirm this with Stacey. With this knowledge, she prepared the deed, conveying the cabin from Stacey to Robert as a gift. She did not prepare any other documents in advance. When she later met with Stacey, King did discuss other possibilities with him, including a will or a trust.

We cannot conclude that King's failure to prepare, in advance of meeting with Stacey, a complete will or a trust, in addition to the grant deed, is evidence of malpractice. Prior to her meeting with Stacey, she had no knowledge of how Stacey might wish to devise his property, other than the cabin, in a will. As for a trust, even one only addressing the cabin, she did not know any of the possible terms of such a trust beyond the property and beneficiary, such as a trustee and other terms. The grant deed, gifting the property to Robert and avoiding probate, was the only of the contemplated instruments she could have completed in advance consistent with what she had been told of Stacey's wishes, which she would confirm at the meeting.

## D. King's Assessment of Stacey's Capacity

To be clear, at issue in this cause of action is not whether Stacey *lacked capacity* to execute the deed. Rather, at issue here is whether King breached her duty of care as an attorney *in her assessment* of whether Stacey lacked capacity to execute the deed.

Probate Code section 810 establishes a rebuttable presumption "that all persons have the capacity to make decisions and to be responsible for their acts or decisions." Further, " '[t]he determination of a person's mental capacity is fact specific, and the level of required mental capacity changes depending on the issue at hand . . . with marital capacity requiring the least amount of capacity, followed by testamentary capacity, and on the high end of the scale is the mental capacity required to enter contracts.' " (*Algo-Heyres v. Oxnard Manor LP* (2023) 88 Cal.App.5th 1064, 1071.) " 'The rules governing capacity to execute a deed are in general the same as those governing testamentary capacity.' " (*Blevin v. Mayfield* (1961) 189 Cal.App.2d 649, 652.) " '[T]he standard for testamentary capacity is exceptionally low.' " (*Doolittle v. Exchange Bank* (2015)

21

241 Cal.App.4th 529, 545.) " ' " 'Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity . . . .' [Citation.]" [Citations.] Rather, testamentary capacity involves the question whether, at the time the will is made, the testator " 'has sufficient mental capacity to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument.' " ' " (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 727; see Prob. Code, § 6100.5, subd. (a).) Nephews and brothers, like plaintiffs here, are not assumed to be the natural object of a decedent's bounty. (*In re Nolan's Estate* (1938) 25 Cal.App.2d 738, 742.) "The attorney who is persuaded of the client's testamentary capacity by his or her own observations and experience, and who drafts the will accordingly, fulfills that duty of loyalty *to the testator*." (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray* (2003) 109 Cal.App.4th 1287, 1299.)

King arrived in Stacey's room at Renown Regional Medical Center at approximately 2:00 p.m. on February 5, 2017. When she arrived, Robert left the room. King's meeting with Stacey lasted approximately 30 minutes. King knew Stacey had recently been taken off life support. However, he "looked like the same old Stacey . . . ." Although he was thin, he was sitting up, smiling, and he had "a twinkle in his eye."

Stacey recognized King. They talked about the past and the work they did together, and Stacey remembered everything, including his father and his brother. He knew who his family was and he knew what his property was. He was attentive for the entire time King was with him. King observed no indication of disordered thinking, Stacey did not wander off topic, and he did not do or say anything to suggest he was hallucinating or suffering from delusions. He remained calm throughout the meeting and never fell asleep.

22

Stacey said he wanted to give his property to Robert, whom he referred to as his best friend. Stacey said Steven could have his bank account and his vehicle, but he did not want him to get the cabin. Stacey did not mention his nephews.

King's testimony demonstrated she used the skill, prudence, and diligence attorneys commonly possess and exercise (*Jones, supra*, 8 Cal.App.5th at p. 550) in determining whether Stacey had " ' "sufficient mental capacity to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument' " ' " (*Andersen v. Hunt, supra*, 196 Cal.App.4th at p. 727).

For the plaintiffs, Dr. Salpeter testified Stacey had every risk factor for delirium when he signed the deed. She testified it would be "essentially impossible" to not be delirious in Stacey's circumstances. She believed he lacked decisionmaking capacity at that time. She further testified generally that delirium did not resolve for days or weeks, and specifically that she believed he had delirium from February 3 through February 20 or 24.

Salpeter noted that medical records for approximately six hours before King visited Stacey in the hospital indicated he was confused, had poor safety awareness, and was disoriented to event and time, but was alert and his speech was clear. At noon, he was characterized as confused, had continued poor safety awareness, was disoriented to time and events, but he was alert and his speech was clear. Salpeter acknowledged two other February 5 entries, however, one indicating he was "oriented to person, place and time, he is active and cooperative," and the other stating he was alert and oriented times four.

Salpeter testified, with a "very high probability of certainty," that Stacey was delirious and lacked decisionmaking capacity on February 5 at 2:00 p.m. when he signed the deed. However, Salpeter never saw Stacey and never communicated with him.

23

Additionally, as her opinion was based on medical records only, and those records did not specify Stacey's mental state at the time of his meeting with King, Salpeter's opinion was of limited relevance to Stacey's capacity "at the very time" the deed was executed. (*Estate of Lockwood* (1967) 254 Cal.App.2d 309, 314 [discussing "well established rule that testamentary capacity is presumed [citation] and that testamentary incapacity must be shown to exist at the very time a will or codicil is executed in order to invalidate the instrument on this ground"], citing *Estate of Russell* (1947) 80 Cal.App.2d 711 [discussing capacity at the time of the execution of the will].)

In light of the fact that Salpeter never met with or examined Stacey, based her opinion exclusively on medical records, and those medical records did not indicate lack of capacity at the time Stacey signed the deed, we conclude her testimony was not substantial evidence to establish King failed to meet the standard of her profession in assessing King's capacity.

Relevant to the latter point, Salpeter did not think someone not trained in formal decisional capacity assessment, such as King, would be able to make an accurate assessment. This testimony illustrates an additional shortcoming in Salpeter's testimony relative to these proceedings. She opined that someone not trained in formal decisional capacity assessment like a physician, in other words, someone like an attorney, would not be able to make an accurate assessment. But, of course, King is not to be held to a standard applicable to a physician. Her duty is to use the skill, prudence, and diligence that members of her profession—attorneys—commonly possess and exercise. (*Jones, supra*, 8 Cal.App.5th at p. 550.) Salpeter's testimony did not provide substantial evidence that King breached that duty.

Dr. Brogan testified that Stacey lacked capacity to sign financial documents from the time of his surgery until February 15, 2017. He was extremely ill and he was postoperative and thus postanesthesia. She did not testify that she saw or examined Stacey on the day he executed the deed. Brogan's opinion, too, was not relevant to

24

King's breach of duty in her assessment of Stacey's capacity "at the very time" the deed was executed. (*Estate of Lockwood, supra*, 254 Cal.App.2d at p. 314.)

The plaintiffs' legal expert, Marshal Oldman, testified a reasonable attorney should have discussed Stacey's decisionmaking capacity with medical personnel. However, he could not cite any authority that supported his opinion that consultation with medical personnel was required, and plaintiffs do not supply any such authority on appeal.

Plaintiffs' evidence concerning Stacey's capacity was exclusively based on medical records, and plaintiffs' physicians who did not meet with or examine Stacey or did not meet with him at the relevant time. And the record entries were not relevant to King's assessment of Stacey's capacity at the specifically relevant time. This evidence did not amount to substantial evidence that, in her assessment of Stacey's capacity, King breached "the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise . . . ." (*Jones, supra*, 8 Cal.App.5th at p. 550.)

## IV

### *The Trial Court's Resolution of the "Equitable" Causes of Action*

Plaintiffs assert the trial court erred in granting Robert's motion denominated one for reconsideration as to the causes of action to quiet title and cancel the deed. They maintain the motion should have been denied for failure to afford them notice and the opportunity to respond. They assert the motion was not based on new or different facts, circumstances, or law as required. (Code Civ. Proc., § 1008.) Elsewhere, they assert that, in making this ruling, the trial court "made another factual determination . . . virtually stripping away [their] right to a trial by jury."

Robert responds, consistent with his motion in the trial court, that plaintiffs were not entitled to a jury trial on equitable issues and that these issues were exclusively for the court to determine.

25

Leaving aside whether Robert's motion was one for reconsideration or was otherwise authorized, contrary to Robert's contentions, we conclude these causes of action were not purely equitable in nature, plaintiffs had the right to a jury trial on them, and, in connection with these causes of action, the jury returned its special verdict finding Stacey lacked capacity to execute the deed. We shall reinstate that special verdict.

"The right to a jury trial is guaranteed by our Constitution." (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8, citing Cal. Const., art. I, § 16.) "[T]he right so guaranteed, however, is the right as it existed at common law in 1850, when the Constitution was first adopted, 'and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact.' " (*C & K Engineering Contractors*, at p. 8.) "As a general proposition, '[t]he jury trial is a matter of right in a civil action at law, but not in equity.' " (*Ibid*.)

Our Supreme Court has instructed: " 'If the action has to deal with ordinary common-law rights cognizable in courts of law, it is to that extent an action at law. In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case -- the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law.' [Citation.] On the other hand, if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial. [Citations.] Although we have said that 'the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded' [citation], the prayer for relief in a particular case is not conclusive [citations]. Thus, '[t]he fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury . . . .' " (*C & K Engineering Contractors v. Amber Steel Co., supra*, 23 Cal.3d. at p. 9.)

" '[A]ctions to quiet title, like true declaratory relief actions, are generally equitable in nature.' " (*Weeden v. Hoffman* (2021) 70 Cal.App.5th 269, 291.) A cause of

26

action to cancel a deed is likewise generally equitable in nature. (*Clyne v. Brock* (1947) 82 Cal.App.2d 958, 961.) "Generally, there is no right to a jury trial in a quiet title action which is fundamentally equitable in nature." (*Estate of Phelps* (1990) 223 Cal.App.3d 332, 340.) However, a "quiet title action becomes a legal action when it takes on the character of an ejectment proceeding to recover possession of the property." (*Ibid*.)

In *Thomson v. Thomson* (1936) 7 Cal.2d 671, our Supreme Court specified categories of quiet title actions, whether each category was equitable in nature or an action at law, and whether the plaintiffs in those categories had a right to a jury trial: "(1) In a simple action to quiet title when the possession of the property is not involved, it is an equitable action. [¶] (2) When the right of possession is involved, the nature of the action, that is whether it is cognizable in an action at law, or in a court of equity, depends upon the following facts and circumstances. [¶] (a) If plaintiff is in possession and no claim is made that he has ousted the defendant of possession, the action is equitable and triable by the court without a jury. [¶] (b) If plaintiff is in possession and defendant by answer or complaint avers that he was recently ousted of possession of the property involved, the action is in reality one at law, and the parties thereto are entitled to a jury trial. [¶] (c) *If the plaintiff is out of possession and seeks by an action to quiet title to recover possession, the action is triable in a court of law*. [¶] (d) If plaintiff is in possession, and the defendant by answer or cross-complaint seeks to eject the plaintiff and recover possession, the action involves both equitable and legal issues. The issues arising out of plaintiff's cause of action are equitable, and those resulting from defendant's answer and cross-complaint are legal. In such an action the plaintiff is entitled to have the equitable issues tried by the court without a jury, and the defendant is entitled to have the legal issues submitted to a jury." (*Id*. at p. 681, italics added; see 6 Miller & Starr, Cal. Real Estate (4th ed. 2023) § 18:26 [cases including *Thomson* "have held that actions seeking merely a declaration of rights are considered *equitable* whereas actions seeking ejectment are *legal*. The legislature's enactment in 1980 of a series of

27

statutes intended to clarify the practice and procedure for filing quiet title actions did not explicitly overrule this prior legal authority, which later cases have relied upon. Accordingly, whether a quiet title action is considered a legal action or an equitable action appears to still require an evaluation of the ultimate remedy sought" (fns. omitted)]; 3 Witkin, Cal. Procedure (6th ed. 2023) Actions, § 143 [discussing former statutory quiet title actions, lack of clarity as to what circumstances gave rise to a right to a jury trial, and citing *Thomson* when stating that "[l]ater cases clarified the situation by pointing out that the action is normally equitable, but becomes a legal action when it takes on the character of an ejectment proceeding, i.e., when the issue is the right to recover possession lost by recent ouster"]; Wegner, Fairbank & Epstein, Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2022) ¶ 2:80 [citing *Thomson* for the premise that "[a]n action for *ejectment* seeks recovery of possession of real property and hence is jury triable.  (But an action seeking only to *quiet* title to property, without affecting possession, is equitable and there is no right to a jury . . . .)"]; 53 Cal.Jr.3d (2023) Quieting Title, § 62 [fully describing, as set forth in *Thomson*, categories of quiet title actions, whether each category was equitable in nature or an action at law, and whether the plaintiffs in those categories had a right to a jury trial]; see also Code Civ. Proc., § 764.020, subd. (b) [nothing in section addressing determination of validity of gift, devise, bequest, or trust under a will in quiet title actions "deprives a party of the right to a jury trial in any case where, by law, the right is now given"].)

Here, paragraph 27 of the complaint alleges:  "Plaintiffs are informed and believe that . . . Robert . . . has changed all of the locks at the Subject Property and has and continues to prevent Plaintiffs from accessing [Stacey's] personal belongings stored at the Subject Property."  In the prayer for relief, among other things, plaintiffs request an order compelling defendants "to transfer legal title *and possession* of the Subject Property back to Plaintiffs, as successors in interest to Stacey," and for an order that they are the sole and rightful owners of the subject property.  (Italics added.)  Further, plaintiffs

28

asserted their quiet title cause of action as successors in interest to Stacey. (See Code Civ. Proc., § 377.20, subd. (a) ["Except as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period"].) As successors in interest, plaintiffs have the same rights as Stacey, who did previously have possession of the subject property. (*Shetty v. HSBC Bank USA, N.A.* (2023) 91 Cal.App.5th 796, 801 [relying on Black's Law Dictionary definition and stating, "general definition of 'successor in interest' is: 'Someone who follows another in ownership or control of property. A successor in interest retains the same rights as the original owner, with no change in substance' "].) Based on their pleadings and these circumstances, plaintiffs were out of possession and sought by an action to quiet title to recover possession. Under *Thomson*, the action is triable in a court of law and plaintiffs were entitled to a jury trial. (*Thomson v. Thomson, supra*, 7 Cal.2d at p. 681; accord, *Medeiros v. Medeiros* (1960) 177 Cal.App.2d 69, 73 [plaintiff was entitled to jury trial where complaint alleged defendants were withholding possession and, even though plaintiff did not specifically seek possession in prayer for relief, right to possession was in issue by facts alleged in complaint and answer].)

While *Thomson* expressly discusses quiet title causes of action but not causes of action to cancel a deed, we see no reason why the latter would be treated differently. Moreover, inasmuch as both causes of action are premised on the same theory—lack of the grantor's capacity—and seek related relief, we conclude any right to a jury trial that attached to a cause of action seeking to quiet title would also apply to a related cause of action seeking to cancel the deed. (See *Weeden v. Hoffman, supra*, 70 Cal.App.5th at pp. 283-285, 292-293 [while complaint set forth separate causes of action to quiet title and cancel instrument, these comprise a single cause of action].)

Plaintiffs had the right to a jury trial on their causes of action seeking to quiet title and cancel the deed. They had a jury trial and the jury in its special verdict concluded Stacey lacked capacity to execute the deed. The trial court erred in granting Robert's

29

motion and setting aside the special verdict to try the matters itself. We shall reverse this portion of the judgment, specifically paragraph three on page three quieting title to the subject property in favor of Robert, reinstate the jury's special verdict, and remand the matter for further proceedings on the causes of action to quiet title and cancel the deed.

## V

### *Plaintiffs' Objections to Procedural Aspects of Both Motions*

Plaintiffs raise certain procedural defects in the motions for judgment notwithstanding the verdict including timeliness and exceeding page limitations. However, plaintiffs make no argument as to prejudice. "There is no presumption of prejudice. [Citations.] Instead, the burden to demonstrate prejudice is on the appellant." (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 528.) Plaintiffs have not met their burden to demonstrate prejudice.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The trial court is ordered to vacate its statement of decision on equitable issues filed February 13, 2020, to enter an order denying defendant Robert Ashley's motion denominated one for "reconsideration" on the grounds that the equitable issue of quiet title was within the exclusive province of the court, and to reinstate the jury's special verdict finding the decedent Stacey Accomazzo lacked capacity at the time he signed the deed. The matter is remanded for further proceedings on the causes of action to quiet title and cancel the deed consistent with this opinion. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3), (5).)

/s/
_____
Horst, J.[*]

---

[*] Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

We concur:


_____/s/_____
Hull, Acting P. J.


_____/s/_____
Mauro, J.